IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SCOTT SWANSON,

OPINION AND ORDER

Plaintiff,

16-cv-705-bbc

v.

EPIC SYSTEMS CORPORATION,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Scott Swanson contends that defendant Epic Systems Corporation failed to hire him as a trainer because of his age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-24. Now before the court is defendant's motion for summary judgment on plaintiff's claim, in which it argues that plaintiff was not hired because of his spotty job history and poor test scores. Dkt. #15. Because I conclude that plaintiff has failed to show that defendant discrimnated against him when it failed to hired him as a trainer, I am granting defendant's motion for summary judgment. The undisputed facts would not permit a rational factfinder to conclude that plaintiff's age was the reason, or the "but-for" cause, of his termination. Accordingly, defendant is entitled to judgment as a matter of law.

From the parties' proposed findings of fact, I find that the following facts are undisputed, except as otherwise noted.

UNDISPUTED FACTS

A.  The Parties and Key Players

In October 2014, when plaintiff Scott Swanson was more than 40 years old, he applied for a job as a trainer with defendant Epic Systems Corporation, a corporation based in Verona, Wisconsin.  During the relevant time period, Carl Dvorak, Allison Stroud and Tanya Bui all worked for defendant:  Dvorak was the president, Stroud was the recruiting director and Bui was a hiring manager.

B.  Defendant's General Hiring Practices

In 2014, defendant received approximately 190,000 inquiries for the position of trainer, and approximately one to two percent of those individuals were hired.  Because defendant receives thousands of job inquiries per year, it has several different hiring managers, who make hiring decisions, and several different recruiters, not all of whom are authorized to make hiring decisions.  There is not one decision maker who is responsible for making all of the hiring decisions for the trainer positions

Defendant trains its recruiters to use its "recruiter training manual," which includes various hiring and recruiting policies, processes and hiring criteria.  As the first step in the hiring process, a recruiter works with the leaders in the department with a vacancy to draft a position description and then posts the description online.  Applicants fill out an initial application and post a résumé online through defendant's website.  Defendant reviews

applicants' résumés as they come in. Defendant does not ask for job applicants' ages directly during the application process.

Relying on the information in the application and résumé, defendant decides whether to move forward with a candidate, request more information from the candidate or reject the candidate. If defendant determines that an applicant can move forward, it conducts a telephone interview with the applicant. After a successful phone interview, a candidate usually takes assessment tests, the topics of which vary from job to job.

If all goes well, the candidate is invited to defendant's "campus" for a final interview. The on-campus interview includes an overview of the corporation, a demonstration of the software, a meeting with someone in the trainer position, an in-person interview with a trainer, a training panel presentation, lunch with other candidates, a tour of defendant's campus and a final meeting with the recruiter. The training panel presentation provides defendant an opportunity to assess a candidate's skills, such as style and teaching abilities. After the on-campus interview, the information from the candidate's application is compiled in a "face sheet," which contains a summary of information, including educational background, test scores, interview feedback and result of reference checks.

The hiring manager and a recruiter participate in a hiring decision meeting, during which the hiring manager has the authority to decide whether to extend an offer to a particular candidate or candidates. Defendant's recruiter training manual includes sample scripts that instruct recruiters on how to provide salary information to a candidate when extending an offer. (The parties dispute whether an offer is complete and can be extended

in the absence of a salary determination.) The manual does not state that a job offer is not complete until it contains a salary. In certain circumstances, the hiring manager and recruiter will have salary information completed in the hiring decisions meeting, and the recruiter then has the authority to extend the job offer. Under defendant's hiring process, job offers should not be extended or communicated to applicants until a final hiring decision has been made.

As the sole recruiting director, Stroud has the authority to make final hiring decisions because she can decide whether to confirm or override the hiring manager's decision to hire a candidate. Dvorak attends weekly meetings with various hiring managers and recruiters during which he provides an opinion on candidates who are presented to him as "close calls" or helps set their salaries if the recruiter wants to offer a salary above the minimum.

1. Consideration of work history and education

When making hiring decisions, defendant considers the likelihood that a candidate will be a reliable employee and will make a commitment to the company. Because defendant makes a significant investment in time and money in new employees and trains them to become subject matter experts in its software, it wants to hire employees who are likely to remain with the company for the long term. When evaluating a candidate's likelihood of being a reliable employee who will make a commitment to the company, defendant considers the candidate's educational and professional background.

Defendant's recruiter training manual states that recruiters should "be cautious" of individuals with "job-hopping." In the section of the manual addressing work history, defendant specifically directs recruiters to consider and evaluate an applicant's experience, growth, gaps in employment and job switching. The manual warns recruiters to be wary of job switching or "job hopping" because:

> There is a noticeable pattern when people leave jobs they have been at for several years. Often they have a period of job-hopping while they experiment with their next career and find the best fit. Candidates don't usually intend to job switch, but it happens as a result of new environments and culture shock. Be cautious if a job with defendant might fit that pattern of experimentation.
>
> If someone has been promoted very recently and is looking to make a job change, this may indicate the person is struggling in that new role. Be cautious of people who are looking to leave a new job after a short period of time. This may also indicate a struggle with their current responsibilities or a lack of follow-through.

Dkt. #19-1 at 20.

The recruiter training manual also states that a candidate's education is "relevant for recent graduates, but also for people who have been in the workforce for some time" and that "[a] high GPA is an indicator of intelligence and/or hard work, and both are important qualities. Look for a high cumulative GPA (preferably 3.4 or above, and definitely above 3.2) from a good school." Dkt. #19-1 at 18.

2. <u>Specific qualifications for application trainer position</u>

Defendant employs a number of different types of trainers. "Application" trainers work with defendant's customers' project staff (as opposed to end users of the software) and

5

train them on the underpinnings of defendant's software, the complexities of configuring it and doing so safely. The position is considered to be entry-level but important. Failure to understand the complexities of defendant's software can affect patient safety, the product's reliability or the customer's success. The job posting for the trainer position states "[n]o technical or software background required." Dkt. #19, exh. 2.

Defendant's recruiter training manual includes specific hiring criteria and "multifactor metrics" for the different trainer positions and discusses the evaluation of assessment scores in particular. Defendant also considers whether the candidate has a bachelor's degree with a minimum grade point average of 3.2, has strong communication skills, meets all assessment requirements, passes the training panel, has a history of academic and professional success and is legally authorized to work in the United States. Because trainers are responsible for providing instruction on the use of defendant's software to its customers and employees, they must be skilled presenters, capable of building rapport with trainees and imparting substantial information about complex subject matters in a relatively short period of time.

Although defendant prefers to hire applicants who meet the criteria listed in its manual, it is willing to allow hiring managers to make exceptions for candidates who meet one of the criteria but do not quite "hit the mark" on all of them. For example, defendant may consider an applicant who scores 50 percent or higher in math in less than 40 minutes (rather than 30 minutes), if the candidate is strong in all other areas. However, there are no written examples of what exceptions are allowed, and defendant's manual states that "[i]f

a candidate has multiple minimum requirements, we should strongly consider not hiring." Dkt. #19-1 at 23.

According to Stroud (the recruiting director), a candidate's grade point average and performance on the assessment tests (such as 20 questions, math and verbal) are the most important criteria for filling the trainer position. Generally she weighs the math scores and 20 questions scores more heavily than verbal test scores because most applicants for trainer positions receive higher scores on the verbal test. A candidate's performance on the assessment tests is not always indicative of a candidate's ability to be a successful employee.

C. Plaintiff's Application and Interviews

On October 5, 2014, plaintiff submitted an employment inquiry and resume for the trainer position that included the following information: he held three advanced degrees in education, including an Ed.D in Educational Leadership from National Louis University in 2012, an M.A. in Curriculum and Instruction from National Louis University in 2008 and a B.A. in English, Creative Writing and English Education from Edgewood College in 2004; his first listed professional experience began in 2003; he had been employed as a teacher in the same school for 10 years; and he was presently employed by the Sauk Prairie School District as an English teacher and an adjunct faculty member at the National Louis University School of Education. Missing from plaintiff's résumé was the fact that in August 2014, he had started working in a non-teaching academic job in the West Allis-West Milwaukee School District.

Bui, the recruiter for the position, received and reviewed plaintiff's employment inquiry. Relying on plaintiff's experience and the fact that he met defendant's preliminary hiring criteria for the trainer position, Bui scheduled a phone interview between plaintiff and another recruiter for October 13, 2014. The interview notes state that plaintiff "went to college in 88-89 and never finished it up" and that plaintiff described himself as a "lost soul for a long time" before he "ended up in broadcasting." Plaintiff told the interviewer that he had attended Northern Iowa University for approximately two and a half years in 1988 and 1989, but missed many of his classes, received poor grades and was placed on academic probation before dropping out. Plaintiff did not include this earlier college experience in his résumé or application. The phone interviewer recommended that plaintiff move forward with the interview process.

Plaintiff next completed defendant's applicant assessments. He scored an eight on the "20 questions" assessment, which was lower than the average score of 12 and the "minimum" score of 10. He scored 50 percent on his math assessment (the average score is 68 percent) in 43 minutes (longer than the 30-minute "maximum"). Plaintiff's 20 questions and math assessment scores are one full standard deviation below the average. His verbal assessment score was 80 percent, which is slightly lower than the average score of 84 percent.

On October 31, 2014, plaintiff advanced to an on-campus interview during which he interviewed with several individuals and made a training presentation to a panel. His training panel scores exceeded defendant's required threshold for consideration of

employment. Three panelists rated plaintiff as "Hire – candidate will do well," and one rated him as "Hire – candidate will excel." Plaintiff's overall training panel score was 3.2 out of 4. The average score of individuals hired into the training position was 3.13.

Around the time of his on-campus interview, plaintiff completed a job application. He omitted various jobs, included incorrect dates of employment and omitted the fact that he had quit college around 1991 after being placed on academic probation for poor grades and failing to attend class. Plaintiff did not include on his application that he had worked as a "cheese caretaker," disc jockey, bartender, warehouse worker at Lands' End and as a tour guide. Plaintiff signed and acknowledged on his job application that "any false statement, omission, or misrepresentation made in connection with my past record or any other part of my application for employment with the company will be justification for dismissal."

Taking into consideration plaintiff's performance before the training panel, his teaching experience and expertise, Bui recommended that plaintiff be offered a position in defendant's training group. Defendant's hiring manager for non-technical roles, Molly Miller, approved the hiring decision, relying on Bui's recommendation at the recruiting team's hiring decisions meeting for the week of November 10, 2014. On November 14, 2014, Bui telephoned plaintiff and told him that defendant might be hiring him. In an email sent the same day, Bui wrote that "[o]nce again, I am delighted to offer you a Trainer position with Epic. Congratulations! . . . I'll be in touch on Tuesday with a salary update and

official offer letter. Have a great weekend!"  Dkt. #30, exh. C at 2.  (The parties dispute whether Bui's communications amounted to a final offer of employment to plaintiff.)

## D.  Dvorak Questions Plaintiff's Application

After plaintiff's on-campus interview, a recruiter brought plaintiff's candidacy to Dvorak for the purpose of setting a potential salary.  When Dvorak reviews an applicant's qualifications for the trainer position, he considers the candidate's assessments before considering work history, if he considers work history at all.  Dvorak reviewed plaintiff's face sheet and immediately noticed that plaintiff's assessment scores were poor.  The math score and the time in which plaintiff completed the math assessment struck Dvorak as particularly poor.  On the basis of these scores, Dvorak questioned plaintiff's candidacy and asked the recruiters why they were considering an offer in the first place.  He suggested to the recruiters that plaintiff be reevaluated "in total," and the recruiting manager stated that they would review plaintiff's application again.  (It is unclear from Dvorak's testimony which recruiting manager he was referring to, but Stroud made it clear in her testimony that Dvorak had spoken with Molly Miller, a hiring manager, about having Stroud reevaluate plaintiff's application.  Dkt. #12 at 57.)  At that time, Dvorak was not aware whether anyone had made a preliminary offer to plaintiff.  Dvorak was not involved in any further discussion of plaintiff's candidacy.  (The parties dispute whether Dvorak and Stroud saw enough information on plaintiff's face sheet to infer that he was more than 40 years old.)

### E.  Stroud Determines Plaintiff is not Qualified

At Dvorak's request, Stroud reviewed plaintiff's application sometime after November 14, 2014.  On November 17, 2014, she made the decision not to extend a job offer to plaintiff for the trainer position.  Stroud had not met plaintiff but had reviewed his application, assessment summary and interview records, which included his training panel scores and telephone interview notes.  She considered plaintiff's entire background, including his education, grade point average, work history (types of jobs, duration, reason for departure, etc.), gaps or jumpiness in work or academic history, references and assessment test scores.  (Defendant uses the terms "jumpy" or "jumpiness" to refer to frequent job switching and to gaps in employment.)

Stroud noted significant gaps in plaintiff's employment history between 1988 and 2003.  Specifically, plaintiff listed two different stints of employment in broadcasting—one between 1996 and 1997 and another between 1998 and 1999.  In 1999, he returned to college to pursue a bachelor degree in English and English Education.  Following college, plaintiff went into teaching and eventually took a non-teaching position at West Allis-West Milwaukee School District.  Plaintiff was with his most recent employer for only a few months before interviewing with defendant.  When Stroud reviewed plaintiff's references, she noted that he had not listed his current employer.  Stroud testified that in her opinion, plaintiff was not qualified for the trainer position.  His work history was unsatisfactory, with significant gaps in employment and his other qualifications and performance measures were

not strong enough to overcome those deficiencies. She concluded that plaintiff should not have advanced to an on-campus interview, much less have been offered a position.

Stroud also noted that all three of plaintiff's assessment scores were below average. Defendant believes that these assessments are predictors of success at the company. However, a chart produced by defendant shows that it has hired individuals who had lower test scores than plaintiff in those three categories and that those employees remain employed at the company. Also, defendant has hired someone who completed the math assessment in a similar amount of time as plaintiff. Stroud directed Bui to document the reason for plaintiff's rejection as "work history – poor jumpy."

On November 17, 2014, defendant notified plaintiff that it would not be extending him any offer of employment. Stroud did not know that Bui had made any offer of employment to plaintiff until after defendant had rejected plaintiff as a candidate. Stroud could not recall an instance in which she rescinded a job offer to a candidate who had been told previously that he was hired.

Defendant subsequently hired a candidate under the age of 40 for the trainer position. In its statement to the Wisconsin Equal Rights Division and its response to plaintiff's interrogatories, defendant stated that plaintiff was not qualified for the trainer position because he had an unsatisfactory work history, which included significant gaps in employment, and his other qualifications and performance measures were not strong enough to overcome his inadequate work history. In response to plaintiff's request that defendant supplement its interrogatory response, defendant stated that the other inadequate

qualifications and performance measures included plaintiff's below average assessment summary test scores.


## F.  Hiring Statistics

### 1.  Rejections for jumpy work history

Since 2012, defendant has rejected 586 applicants for the trainer position for the stated reason of "work history – poor jumpy."  Assuming these applicants were 22 years old when they graduated from college, at least 321 of the rejected applicants are still currently under the age of 40.  In 2014, the year plaintiff applied, defendant rejected 105 applicants for a trainer position in whole or in part because their work history was rated as "poor/jumpy." Assuming those applicants were 22 years old when they graduated from college, more than half of the rejected applicants were under the age of 40.  The majority of the candidates who scored as poorly as plaintiff on all three assessment tests were under 40, and none were given job offers.


### 2.  Dr. Patricia Mullins

Dr. Mullins was retained by plaintiff and prepared a statistical report using a spreadsheet provided by plaintiff's attorneys.  The spreadsheet includes data about individuals who applied for defendant's trainer position at some point between 2012 and 2014.  (The parties dispute the number of applicants, the time period and the particular

information considered by Mullins.)  Mullins reached the following conclusions in her expert

report:

- An individual of plaintiff's age (44 years) at the time of his application had a 13.57 percent probability of being hired by defendant as a trainer, whereas an individual who was 21 years old at the time of application had a 33.17 percent probability of being hired.

- 6.3 percent of all applicants were more than 41 years old, and none of them were hired.

- The older an applicant is, the less likely he or she is to be hired as a trainer by defendant.

- Defendant hired candidates for the trainer position based only on their age.

OPINION

A.  Legal Standard

Summary judgment is appropriate if the moving party "shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment."  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In considering defendant's motion for

summary judgment, I must credit plaintiff's evidence and draw all reasonable inferences in

his favor.  Id. at 255.  In opposing defendant's motion, plaintiff "does not bear the burden

of proving his case," but to defeat a properly supported motion for summary judgment he

must adduce "evidence that can be put in an admissible form at trial, and that, if believed

by the factfinder, could support judgment in his favor." Marr v. Bank of America, N.A., 662 F.3d 963, 966 (7th Cir. 2011).

Plaintiff brings his claim under the Age Discrimination in Employment Act, which makes it unlawful for an employer to fail to hire or otherwise discriminate against an individual because of his age. 29 U.S.C. § 623(a)(1). Because plaintiff was 44 years old at the time he applied for a job with defendant, he qualifies for protection under the Act, which protects individuals 40 years old and over. § 631(a). To succeed on his claim, plaintiff "must produce evidence from which a jury could infer that h[is] age 'was a but-for cause of'" defendant's decision not to hire him. Ripberger v. Corizon, Inc., 773 F.3d 871, 880 (7th Cir. 2014) (quoting Fleishman v. Continental Casualty Co., 698 F.3d 598, 603 (7th Cir. 2012); citing Gross v. FBL Financial Services, Inc., 557 U.S. 167, 176 (2009)).

Until recently in this circuit, a plaintiff relied on either the direct or indirect methods of proof to prove intentional discrimination. Under the direct method, a plaintiff "would prove discriminatory intent without reliance on inference or presumption," Harper v. Fulton County, Illinois, 748 F.3d 761, 765 (7th Cir. 2014), or circumstantial evidence, including suspicious timing and evidence that similarly-situated individuals received systematically better treatment. Hutt v. AbbVie Products LLC, 757 F.3d 687, 691 (7th Cir. 2014). The indirect method involved a burden-shifting framework, requiring a plaintiff to first establish a prima facie case showing that he applied for an open position for which he was qualified and that those who were hired instead of him were not in the protected class and had similar or lesser qualifications. Whitfield v. International Truck & Engine Corp., 755 F.3d 438, 444

15

(7th Cir. 2014). If plaintiff satisfied that standard, the burden shifted to the employer to offer a nondiscriminatory reason for the employment action, which the plaintiff could rebut by showing that the employer's asserted explanation was pretextual. David v. Board of Trustees of Community College District No. 508, 846 F.3d 216, 225 (7th Cir. 2017).

As plaintiff observes, the Court of Appeals for the Seventh Circuit explained in Ortiz v. Werner Enterprises, Inc., 834 F.3d 760, 765 (7th Cir. 2016), that there is no meaningful legal distinction between proving a claim by direct evidence and proving it with indirect evidence. The court of appeals has instructed district courts to "stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards," and determine "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's . . . proscribed factor caused the discharge or other adverse employment action." Id. ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'"). In sum, "[i]n adjudicating a summary judgment motion, the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" David, 846 F.3d at 224. Therefore, I will consider plaintiff's evidence as a whole and not distinguish between direct and indirect evidence or methods of proof.

B. <u>Plaintiff's Evidence of Discrimination</u>

Defendant contends that Stroud, the final decision maker with respect to the hiring decision, did not know plaintiff's age and refused to hire plaintiff as a trainer, not because of his age, but because he had a poor and jumpy work history and his assessment scores failed to meet defendant's well-documented hiring criteria. Plaintiff disputes these contentions and argues that the following evidence shows that they are merely pretext for age discrimination: (1) defendant's purported reasons for not hiring plaintiff are poorly defined, inconsistently applied and inaccurate; (2) suspicious timing (one day) between Bui's offer of employment to plaintiff and Stroud's decision to rescind that offer after she reviewed plaintiff's application materials, which contained information from which she could extrapolate his age; (3) defendant's more favorable treatment of similarly-situated applicants under the age of 40; and (4) statistical and anecdotal evidence of defendant's discriminatory hiring practices against older workers. Defendant refutes all of plaintiff's contentions.

1. <u>Knowledge of plaintiff's age</u>

In an initial argument, defendant denies that it asks its applicants their ages, that Stroud ever met plaintiff or knew his age when she reviewed his application materials and decided not to extend him a job offer. However, as plaintiff points out, it is undisputed that Stroud reviewed the notes from defendant's telephone interview with plaintiff and those notes stated that plaintiff attended college in 1988 and 1989. Therefore, a reasonable jury could conclude that Stroud was aware that plaintiff was at least 18 years old when he first

attended college in 1988 and more than 40 years old when he applied for the job with defendant in 2014.

## 2. Challenges to defendant's reasons for not hiring plaintiff

### a. shifting rationale

In an attempt to show that jumpy work history and low test scores were not the real reasons defendant failed to hire him as a trainer, plaintiff points out that defendant has provided different or "shifting" reasons for its decision. Specifically, plaintiff notes that when defendant provided its position statement to the Equal Rights Division and its initial response to plaintiff's interrogatories, it stated that plaintiff was not qualified for the trainer position because he had an unsatisfactory work history, which included significant gaps in employment, and his "other qualifications and performance measures were not strong enough to overcome his inadequate work history." Dkt. #41 at ¶ 49. After plaintiff asked defendant to supplement that response, defendant provided the following clarification: "Other qualifications and performance measures that could not overcome his inadequate work history include, but are not limited to, Mr. Swanson's training panel scores, grade point average, and tests scores." Id. at ¶ 50. Although an employer's shifting and inconsistent explanation for taking adverse employment action can provide evidence of pretext, plaintiff cannot avoid summary judgment without pointing to specific facts that cast doubt on the legitimate reasons offered by defendant or raise significant issues of credibility. Pantoja v. American NTN Bearing, 495 F.3d 840, 851 (7th Cir. 2007); Schuster v. Lucent

Technologies, Inc., 327 F.3d 569, 577-79 (7th Cir. 2003); Rand v. CF Indus., Inc., 42 F.3d 1139, 1146 (7th Cir. 1994).  The fact that defendant responded to plaintiff's request to further define what it meant by "other qualifications and performance measures" does not rise to the level of an inconsistent statement from which a discriminatory motive can be inferred.  Schuster, 327 F.3d at 579 ("The alleged last-minute switch from relying on Schuster's scores on his talent profile to relying on specific work-performance deficiencies as a rationale for his termination is an additional, not necessarily inconsistent reason for the employment decision, rather than an abrupt change in explanation.").

b.  poorly defined and inconsistently applied criteria

Next plaintiff contends that defendant does not have any set criteria for the trainer position.  Specifically, he points out that both Dvorak and Stroud testified that a jumpy work history is not a reason for which defendant "typically disqualifies" a candidate and that its recruiter training manual merely warns recruiters to be cautious of individuals with "job hop," and not to disqualify such candidates.  However, a review of the recruiter training manual and relevant deposition testimony reveals that defendant is concerned with gaps and frequent job changes in a candidate's work history.  It is undisputed that the manual directs recruiters to consider and evaluate gaps in an applicant's employment and job switching because "[t]here is a noticeable pattern when people leave jobs they have been at for several years."  In addition, plaintiff's characterization of Stroud's and Dvorak's testimony is not accurate.  Although Stroud and Dvorak testified that a jumpy work history does not

necessarily or automatically disqualify a candidate, they both stated that the determination whether a candidate has an unacceptable work history is made on a case-by-case basis after considering many factors and that many applicants have been rejected based at least in part because of a poor or jumpy work history.  It is undisputed that from 2012 to the present, defendant has rejected 586 applicants for the trainer position because their work history was "poor/jumpy" and that 321 of those applicants were under the age of 40.

Plaintiff also argues that defendant does not clearly define a "jumpy" work history or have "minium" or well-defined criteria for the trainer position because it allows its recruiters the discretion to disqualify candidates with any work history, warning them to look out for individuals working in a position for too long or not long enough.  Defendant contends that it has minimal criteria, but even if a stable work history is not a minimum criterion for the trainer position, the fact that defendant applied it in plaintiff's case does not mean that it had discriminatory intent.  An employer is allowed to set its own criteria for job applicants, even if those criteria are capable only of subjective evaluation.  Millbrook v. IBP, Inc., 280 F.3d 1169, 1176 (7th Cir. 2002) (finding no evidence that subjective criteria employer considered in evaluating plaintiff and other candidates served as a "mask for discrimination"); Dorsch v. L.B. Foster Co., 782 F.2d 1421, 1427 (7th Cir. 1986) (a "subjective qualification assessment does not convert an otherwise legitimate reason into an illegitimate one").  Plaintiff argues that only recent college graduates will meet this "Goldilocks" criteria, but this assertion is not enough to prove discriminatory intent in plaintiff's case.  E.E.O.C. v. Francis W. Parker School, 41 F.3d 1073, 1077 (7th Cir. 1994)

("[D]ecisions based on criteria which merely tend to affect workers over the age of 40 more adversely than workers under 40 are not prohibited.").  At most, plaintiff has shown is that some of defendant's hiring practices may adversely affect applicants over the age of 40, but without more, a reasonable jury could not conclude that Stroud intended to discriminate against plaintiff or older applicants in particular.

c.  defendant's reasons are inaccurate

Plaintiff argues briefly that even under defendant's criteria, he does not have a jumpy work history because he taught at one school for 10 years and had three advanced degrees in education.  However, "[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered." O'Leary v. Accretive Health, Inc., 657 F.3d 625, 635 (7th Cir. 2011).  See also Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000) (Even if the employer's reasons for not selecting plaintiff were "mistaken, ill considered or foolish, so long as [the employer] honestly believed those reasons, pretext has not been shown.").

Stroud testified that she was concerned about the "significant gaps" in plaintiff's employment history between 1988 and 2003.  If that were the only deficiency she was concerned about, plaintiff may have a good argument for pretext.  It is unlikely that an employer would be concerned with a 25-year old's "jumpy" work history, especially in light of the fact that plaintiff later earned three degrees and held a teaching position for 10 years. However, Stroud also made it clear that she was concerned that plaintiff was applying for

an entry level job outside the academic field only a few months after taking an administrative position. In addition, Stroud noted that all of plaintiff's test scores were lower than the average scores of successful candidates. Without other evidence from which to infer discriminatory intent, no reasonable jury would doubt that defendant believed these reasons were good enough to deny plaintiff the job.

Plaintiff argues generally that several successful candidates for the trainer position held more jobs during a shorter period of time than he did and that defendant has been willing to make exceptions for those candidates, as well as some candidates who had assessment scores that did not meet the scoring criteria. As the undisputed facts make clear, however, defendant's decision makers take many factors into consideration in deciding whether to hire a particular candidate. For example, an applicant with one low test score may have other areas in which he or she excelled. As discussed in the next few sections of this opinion, without a proper comparison between plaintiff's qualifications and those of the successful candidates, the fact that defendant may have hired some individuals with a varied work history or a similarly low test score is not enough to show that defendant discriminated against plaintiff. In sum, plaintiff's general references to defendant's inconsistent or poorly defined criteria are not sufficient to create a genuine issue of material fact as to defendant's discriminatory intent.

3. Similarly-situated applicants treated more favorably

To be similarly situated, the individuals "must be directly comparable to [the plaintiff] in all material respects." Zayas v. Rockford Memorial Hospital, 740 F.3d 1154, 1158 (7th Cir. 2014) (internal quotations omitted) (quoting Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002)). Relevant factors include whether the applicants "were similarly situated with respect to performance, qualifications, and conduct" and whether the decisions to hire those applicants were made by a common decision maker. Balderston v. Fairbanks Morse Engine Division of Coltec Industries, 328 F.3d 309, 320 (7th Cir. 2003) (citing Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)); St. Louis v. American Family Mutual Insurance Co., 300 F. Supp. 2d 813, 827 (W.D. Wis. 2003).

Although plaintiff generally discusses the existence of similarly situated individuals in his response brief, he fails to identify a younger applicant with a similar work history and similarly low test scores who was hired by Stroud, which he must do to raise an inference of intentional discrimination. Plaintiff states only that the 16 applicants who were hired after him were under the age of 40 and all of them had four or more jobs over a three year period, including one successful candidate who worked eight different types of jobs in a five-year period. Plaintiff does not discuss the test scores of these individuals. He does not say whether Stroud reviewed their applications or show that these successful applicants were hired for the same position plaintiff was seeking.

In support of his contentions, plaintiff merely cites a proposed finding of fact comprising a list of candidates that defendant hired as trainers after it rejected plaintiff as

a candidate. Dkt. #41 at ¶ 64. It is unclear from this chart whether these candidates were hired as application trainers. It does not appear that all of them were because plaintiff identifies one individual as a technical trainer. Although the list seems to contain data about some of the candidates' education, employment history and test scores, plaintiff fails to discuss any of this information in his brief or compare the candidates' qualifications to his own. In addition, plaintiff has not included the test scores for all of the successful applicants, including the applicant with the "jumpiest" work history. By failing to develop his argument in any meaningful way, plaintiff has waived it. Campania Management Co., Inc. v. Rooks, Pitts & Poust, 290 F.3d 843, 852 (7th Cir. 2002) ("Perfunctory and undeveloped arguments are waived.").

In sum, with the scant evidence adduced by plaintiff, a reasonable jury could not infer that he was similarly situated to any of the younger, successful candidates or that defendant discriminated against him when it decided not to hire him. St. Louis, 300 F. Supp. 2d at 823 (finding same).

4. Suspicious timing of Stroud's decision

Plaintiff contends that the timing between Bui's offer of employment on Friday and Stroud's decision to rescind that offer on Monday is "deeply suspicious." He points out that it took Bui weeks to determine from telephone and in-person interviews, testing and feedback from other Epic employees that he was qualified for the trainer position. Nonetheless, Stroud overrode this decision in one day, after briefly reviewing plaintiff's

application.    Although the temporal proximity between learning about a plaintiff's membership in a protected class and an adverse employment action can sometimes be circumstantial evidence of discriminatory intent, Coleman v. Donahoe, 667 F.3d 835, 860 (7th Cir. 2012), the Court of Appeals for the Seventh Circuit has made it clear that "suspicious timing alone is rarely sufficient to defeat a motion for summary judgment." Silverman v. Board of Education of City of Chicago, 637 F.3d 729, 736 (7th Cir. 2011), overruled on other grounds by Ortiz, 834 F.3d 760 ("Taken separately or taken together, [the employer's] comment, the conflicting dates regarding when [the employer] found out [plaintiff] was pregnant, and the timing of her non-renewal do not reach the threshold necessary."). See also Cole v. Illinois, 562 F.3d 812, 816 (7th Cir. 2009) ("[M]ere temporal proximity is not enough to establish a genuine issue of material fact.").

Here, the temporal proximity between Stroud's possibly inference of plaintiff's age and her decision not to offer him the position shows little about her intent to discriminate. Stroud reviewed plaintiff's application at the request of Dvorak, who expressed concern about plaintiff's poor assessment scores. Although Stroud took the unusual step of reversing a decision that a hiring manager had communicated to plaintiff, plaintiff has not shown anything about the timing of that decision that made it more likely that Stroud based it on plaintiff's age rather than on his work history or assessment scores.    Teruggi v. CIT Group/Capital Finance, Inc., 709 F.3d 654, 662 (7th Cir. 2013) ("[W]ithout any connection between the [workers' compensation] claim and [plaintiff's] termination, this timing is not at all suspicious."); Lang v. Illinois Dept. of Children & Family Services, 361 F.3d 416, 419

(7th Cir. 2004) ("Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link."). Accordingly, I find that a reasonable jury could not infer discriminatory intent from the fact that Stroud decided not to hire plaintiff within a day after reviewing his application materials.

5. Statistics

Finally, plaintiff states that he has "statistical and anecdotal evidence of defendant's discriminatory hiring practices." (The parties agree that plaintiff is attempting to show discriminatory treatment by defendant and is not bringing a disparate impact claim. Francis W. Parker School, 41 F.3d at 1077) (although 29 U.S.C. § 623(a) authorizes recovery in disparate impact cases, it omits "applicants for employment" from its coverage).) In particular, plaintiff cites the expert report of Dr. Mullins, who reviewed a spreadsheet containing information on applicants who had applied for the trainer position with defendant between 2012 and 2014. Mullins found that even though 6.3 percent of all applicants for the position were more than 41 years old, none were hired. She also determined that there was a 33.17 percent probability that a 21-year-old applicant would be hired but only a 13.57 percent probability that a 44-year-old applicant would be hired. (Although plaintiff also states generally that it is well known that defendant prefers hiring individuals out of college rather than experienced candidates who are harder to mold into an "Epic person," dkt. #27 at 13 (citing newspaper article and excerpts from defendant's

26

recruiter manual about candidates with many years of experience), he has waived the argument by failing to develop it in any meaningful way. Campania Management, 290 F.3d at 852.)

Defendant challenges the relevancy and reliability of Mullins's report. As it points out, the Supreme Court has emphasized the importance of looking at the proper base group when making statistical comparisons. Hemsworth v. Quotesmith.Com, Inc., 476 F.3d 487, 492 (7th Cir. 2007), overruled on other grounds by Ortiz, 834 F.3d 760 ("Statistical evidence is only helpful when the plaintiff faithfully compares one apple to another without being clouded by thoughts of Apple Pie ala Mode or Apple iPods."); Balderston, 328 F.3d at 320 ("In order to be considered, the statistics must look at the same part of the company where the plaintiff worked; include only other employees who were similarly situated with respect to performance, qualifications, and conduct; the plaintiff and the other similarly situated employees must have shared a common supervisor; and treatment of the other employees must have occurred during the same [reduction in force] as when the plaintiff was discharged."). Further, "statistics can only show a relationship between an employer's decisions and the affected employees' traits; they do not show causation." Radue, 219 F.3d at 616-17. See also Cung Hnin v. TOA (USA), LLC, 751 F.3d 499, 508 (7th Cir. 2014) (statistical evidence must give sufficient context to permit inference of illegal intent); Tagatz v. Marquette University, 861 F.2d 1040, 1044 (7th Cir. 1988) ("Correlation is not causation."). "Because the occurrence of adverse employment actions may correlate to older

employees for reasons other than intentional discrimination, causation is suggested only when the other variables are shown to be insignificant." Radue, 219 F.3d at 616.

Defendant argues that Mullins did not provide a meaningful comparison among the applicants for the trainer position and ignored non-discriminatory explanations for why younger applicants were more likely to be hired than applicants over the age of 40. I agree. A review of Mullins's report and deposition testimony shows that she did not consider defendant's criteria for the trainer position or take into account any of the applicants' education, employment, assessment scores, training panel feedback or references. Dkt. #13 at 15, 33-34. In fact, she did not review plaintiff's application and reviewed the application materials of only three other applicants. Id. Plaintiff states in his response brief that the spreadsheet that Mullins received contained "multiple variables" that she considered to get a "summary picture" of the applicants. Dkt. #27 at 13. However, neither plaintiff nor Mullins discusses these variables or explains how Mullins accounted for them in her analysis. In any event, the chart used by Mullins does not contain the applicants' assessment scores or the number or length of the jobs held by each applicant. Dkt. #31, exh. 2. Further, as discussed above, neither plaintiff nor Stroud verified whether Stroud was the only decision maker during the relevant time period.

In sum, Mullins did not provide sufficient context for her comparison between the younger and older applicants or control for hiring decisions based on work history or assessment scores in reaching her conclusions. Therefore, I find that in the absence of other clear evidence of discriminatory motive, Mullins's statistical analysis is insufficient to allow

the court to infer that defendant intentionally discriminated against plaintiff because of his age. Accordingly, defendant is entitled to summary judgment.

ORDER

IT IS ORDERED that defendant Epic Systems Corporation's motion for summary judgment, dkt. #15, is GRANTED. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 11th day of December, 2017.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge